UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

IN RE:                                                                                    Chapter 11 Case

NATIONAL AUTO LENDERS, INC.,[1]                          Case No. 18-_____

    Debtor.
_____/

## DECLARATION IN SUPPORT OF FIRST DAY PLEADINGS

I, Dania Ramos-Infante, hereby declare that the following is true to the best of my knowledge, information, and belief:

### I. INTRODUCTION

1. My name is Dania Ramos-Infante. I am over the age of eighteen and am competent to testify.

2. I am the Vice-President, Chief Operating Officer and Chief Financial Officer of National Auto Lenders, Inc. ("NAL," the "Company" or "Debtor").

3. NAL was incorporated under the laws of the State of Florida on April 24, 1996.

4. I graduated from the University of Florida ("UF") in 1983, and hold a Bachelor's degree in Accounting. After graduation from UF, I was employed by Price Waterhouse as an accountant and held that position until 1989. After Price Waterhouse, I worked for Little Havana Activities & Nutrition Centers of Dade County until 1992 and then I worked for UCS, Inc. until 2000. I joined NAL as an owner in 1996, and full-time employee in 2000. I am a Certified Public Accountant ("CPA") since 1985, in good standing. I am a member of the American Institute of Certified Public Accountants (AICPA) and the Florida Institute of Certified Public Accountants (FICPA).

---

[1] The Debtor's address is 14645 NW 77th Avenue, Suite 203, Miami Lakes, FL 33014. The last four digits of the Debtor's federal tax identification number are 0723.

5. To minimize any adverse effects on its business as a result of the commencement of this chapter 11 case (the "Chapter 11 Case"), the Debtor intends to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief, among other things, to (a) continue employee benefits and compensation practices in order to maintain the confidence, morale, and support of the Debtor's employees; and (b) establish procedures for the smooth and efficient administration of these cases. The relief requested in the First Day Motions is crucial to the success of the Debtor's goal of restructuring its finances and continuing in business post-bankruptcy.

6. I am advised by counsel that this Court has jurisdiction over this Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1408 and 1409.

7. I submit this declaration (the "Declaration") in support of the Debtor's petition for Chapter 11 reorganization and the First Day Motions. In my capacity as Vice-President, Chief Financial Officer, and Chief Operating Officer, I have general knowledge of Debtor's business, its books and records, and financial and operational affairs. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees or advisors, or my opinion based upon my experience with the Debtor's operations and financial condition. In making the statements herein based upon my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees to accurately record, prepare and collect any such documentation and other information.

8. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or my personal opinion.

9. I am authorized to submit this Declaration on behalf of the Debtor.

10. Part II of this Declaration describes the business of the Debtor and the developments which led to the Debtor filing its voluntary chapter 11 petition. Part III sets forth the relevant facts in support of the various First Day Motions, emergency or otherwise, and applications filed by the Debtor concurrently herewith. Part IV summarizes the Debtor's objectives in this Chapter 11 Case.

## II. BACKGROUND

**A. The Chapter 11 Filing.**

11. On the date hereof (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C §§ 101 et. seq. (the "Bankruptcy Code").

12. The Debtor intends to operate its business and to manage its property as a debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

13. The Debtor commenced this Chapter 11 Case in order to stabilize its operations for the benefit of its customers, secured creditors, employees, vendors, and other unsecured creditors. The Debtor will work diligently to file a Chapter 11 plan within the exclusive period in order to minimize fees, preserve the value of its assets, and maximize recovery for its stakeholders.

**B. Overview of the Debtor.**

14. The Debtor is based in Miami Lakes, Florida, and provides sub-prime automobile financing to retail customers. Specifically, the Debtor purchases sub-prime automobile loans from auto dealers throughout the country and services the loans it acquires.

15. As of the Petition Date, the Debtor owns approximately 4,323 sub-prime loans. The approximate gross aggregate amount (principal and interest combined) outstanding and anticipated for collection under such loans is $86,539,291, and the outstanding principal due under such loans (net of interest payable through to maturity) is $58,840,038. In addition, as of the Petition Date, the Debtor owns approximately 348 repossessed automobiles which have an approximate aggregate carrying value of $4,969,637.

16. As of the Petition Date, NAL employs a total of 73 employees, all of which are full time employees (collectively, the "Employees"). Of the 73 Employees, 46 are hourly wage earners, 20 are salaried personnel, and 7 commissioned employees. In addition, NAL has 4 independent contractors (2 of whom are relatives of management) who serve the company in a variety of functions.

C. **Present Day Structure of Operations.**

17. The majority of the Employees have been with the Company for more than 6 years, and some have been with the Company since its inception.

18. NAL provides benefits to its employees, including, among others, medical, dental, vision, and life insurance coverages, as well as a tuition reimbursement, a 401(k) program, and a cafeteria 125 plan.

19. NAL's senior management team is comprised of: (i) Osvaldo (Ozzie) F. Ramos, as President and Chief Executive Officer; (ii) myself, as Vice-President, Chief Operating Officer and Chief Financial Officer; (iii) W. Knox North, Chief Technology Officer; (iv) Nereida Feliz, Executive Vice President; and (v) John Graham, General Counsel.

D. **The Debtor's Debt Structure.**

20. NAL, Wells Fargo Bank, N.A. (successor by merger with Wells Fargo Preferred Capital, Inc.), as agent and lender (the "Agent") and BankUnited, N.A. (together with the Agent,

the "Lenders"), are parties to that certain Second Amended and Restated Loan and Security Agreement dated as of July 1, 2013, as further amended by a First Amendment to Second Amended and Restated Loan and Security Agreement dated as of April 19, 2016 (collectively, the "Loan Agreement") and certain instruments, documents, agreements, and guaranties executed in connection therewith (together with the Loan Agreement, the "Loan Documents"). Pursuant to the Loan Documents, the Lenders provided working capital financing to the Debtor. The outstanding principal balance due the Lender is approximately $36,250,000.

21. As of the Petition Date, there was approximately $27,864,415 in general unsecured obligations. Of this total, $23,876,506 is owed to Debtor's subordinated unsecured debenture holders, who are non-insiders; $2,230,005 in general unsecured debt owed to unsecured trade creditors; and $1,757,904 owed to insiders.

E. Events Leading to the Filing of the Chapter 11 Cases.

22. The debt due from the Lenders to the Debtor matured on July 31, 2018, shortly following the natural disasters of Hurricanes Irma and Harvey, that struck in both of Debtor's principal markets, Florida and Houston, Texas. The Debtor incurred operating losses in 2017, aggregating to $2.9 million attributable to Hurricanes Irma and Harvey. Approximately 60% of the Debtor's then outstanding loans were secured by automobiles in these two markets. On November 27, 2017, the Lenders gave notice of the Debtor's defaults under the Loan Documents for Debtor's failure to comply with Sections 6.3(a) (*EBITDA Ratio*) and 6.3(e) (*Tangible Net Worth*) of the Loan Agreement for a number of months during 2017 and 2018. The Debtor has not been permitted to borrow money from the Lenders since September of 2017. Since that date, the Debtor has financed its operations exclusively by use of cash collateral. Also since September of 2017, the Debtor has paid the Lenders approximately $14,114,501, in principal, interest and fees, and the principal amount due from the Debtor to the Lenders has been reduced by more than

5

$9,748,047. The Debtor achieved this principal reduction notwithstanding the Lenders' increasing their interest rate by 500 basis points to more than 11% as of May 21, 2018. The Debtor has paid Lenders more than $873,400 in this increased default rate interest, since May 21, 2018. The Debtor has never been in monetary default of its obligations under the Loan Documents. Debtor has timely paid all principal and interest required by the Loan Documents. Notwithstanding substantial equity in the Lenders' collateral, the Debtor and the Lenders were unable to reach agreement on the terms of a forbearance agreement. Accordingly, the Debtor commenced this Chapter 11 case to preserve the going concern value of the business for all stakeholders and to implement a financial restructuring.

F.    **The Debtor's Financial Overview**

23.    The Company's total annual revenues and earnings for the prior fiscal years was:

| FYE: | Total Revenue | Net Income (Loss) |
|---|---|---|
| Average (2011-2014) | 13,366,423 | $1,189,912 |
| 2015 | $19,967,283 | $1,043,835 |
| 2016 | $20,964,304 | $1,154,000 |
| 2017 | $17,926,485 | ($2,957,061) |

24.    For the first three quarters of 2018, total revenue was $11,175,212, and its net loss was $2,930,529 (reflecting default interest and legal expenses aggregating to $812,781).

25.    NAL's total net income or loss as reported on its tax returns was as follows:

| FYE | Total Income/[loss] |
|---|---|
| 2015 | $ 1,152,358 |
| 2016 | $   995,567 |
| 2017 | ($2,643,536) |

G. **Objectives of Chapter 11 Filing.**

26. The Debtor commenced this Chapter 11 Case in order to in order to stabilize its operations for the benefit of its customers, secured creditors, employees, vendors, and unsecured creditors. The Debtor's immediate objective is to stabilize its operations by obtaining the relief requested in the First Day Motions and then to proceed expeditiously towards the goal of restructuring of its financial affairs for the benefit of its customers, secured creditors, employees, vendors, and unsecured creditors.

### III. FIRST-DAY MOTIONS

27. Concurrently with the filing of this Chapter 11 Case, the Debtor will be filing a number of First Day Motions. The Debtor requests that the Court conduct a hearing as soon as possible after the commencement of the Debtor's bankruptcy case (the "First Day Hearing"), during which the Court will hear arguments of counsel with respect to the First Day Motions.

28. I have reviewed each of the First Day Motions, including the exhibits thereto and I believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described below and, ultimately, will be critical to the Debtor's ability to restructure its financial affairs and to avoid immediate and irreparable harm to the Debtor's estate.

A. **Debtor's Application for Approval, on an Interim and Final Basis, of the Employment of Paul Steven Singerman and the Law Firm of Berger Singerman LLP as Counsel for Debtor-in- Possession, *Nunc Pro Tunc* to Petition Date (the "BSLLP Application").[2]**

29. The Debtor seeks authority to retain, on an interim basis, Paul Steven Singerman and the law firm of Berger Singerman LLP as general bankruptcy counsel *nunc pro tunc* to the Petition Date. As detailed in the BSLLP Application, the Debtor understands that Mr. Singerman and BSLLP have extensive experience representing chapter 11 debtors in this district (and other

---

[2] Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the respective motion or application, as defined, in this section of the Declaration.

districts across the country) and that they are well-qualified to serve as general bankruptcy counsel to the Debtor.  The Debtor believes it is in its best interests, and those of its creditors, that Mr. Singerman and BSLLP be retained to serve as Debtor's general bankruptcy counsel in its Chapter 11 Case.

30. To the best of the Debtor's knowledge, except as disclosed in the Declaration of Paul Steven Singerman on Behalf of Berger Singerman LLP as Proposed Counsel for Debtor-In-Possession, *Nunc Pro Tunc* to the Petition Date, affirmed by Mr. Singerman and filed by BSLLP which accompanies the BSLLP Application to retain it, neither Mr. Singerman nor BSLLP has any connection with the Debtor's creditors or other parties in interest or their respective attorneys.  Counsel has informed me that corporations like NAL may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf.  Because there is a myriad of relief that must be sought from the Court immediately, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened. For example, the Debtor requires the Court approve the use of its existing cash management system.  Without the ability to continue using their cash management system, the Debtor will be unable to operate and maximize value for the benefit of its estate. It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided.  In that regard, counsel advises that this relief, as contemplated by Bankruptcy Rule 6003, has been granted in numerous chapter 11 cases in this District, including large chapter 11 cases. *See*, *e.g.*, *In re Adinath Corp., et al.*, Chapter 11 Case No. 15-16885-LMI (Bankr. S.D. Fla. April 21, 2015); *In re McGuire Holdings*, Chapter 11 Case No. 11-39347-RAM (Bankr. S.D. Fla. Oct. 27, 2011); *In re HearUSA, Inc.*, Chapter 11 Case No. 11-23341-EPK (Bankr. S.D. Fla. May 20, 2011); *In re Gulfstream Intern. Group, Inc.*, Chapter 11 Case No. 10-44131-BKC-JKO (Bankr. S.D. Fla. Nov.

8, 2010); *In re Medical Staffing Network Holdings, Inc., et al.*, Chapter 11 Case No. 10-29101-BKC-EPK (Bankr. S.D. Fla. July 8, 2010); *In re Gemini Cargo Logistics, Inc., et al.*, Chapter 11 Case No. 08-18173-BKC-PGH (Bankr. S.D. Fla. June 20, 2008); *In re First NLC Fin. Services, LLC*, Chapter 11 Case No. 08-10632-BKC-PGH (Bankr. S.D. Fla. Jan. 28, 2008); *In re Tousa, Inc.*, Chapter 11 Case No. 08-10928-BKC-JKO (Bankr. S.D. Fla. Jan. 31, 2008) and by other bankruptcy courts throughout the country.  Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to retain BSLLP as the Debtor's general bankruptcy counsel.

**B.** **Debtor's Application for Approval, on an Interim and Final Basis, of Employment of Development Specialists, Inc. as Financial Advisor to the Debtor, *Nunc Pro Tunc* to the Petition Date ("DSI Application")**

31. The Debtor seeks authority to retain Development Specialists, Inc. ("DSI"), *nunc pro tunc* to the Petition Date, pursuant to sections 105(a) and 327(a) of the Bankruptcy Code.  The Debtor understands that DSI has significant and extensive experience in providing advisory services to companies undergoing a financial restructuring, including in chapter 11 bankruptcy cases. The Debtor understands that DSI has an excellent reputation for providing such services throughout the United States in restructuring matters, and that it is well-qualified to provide services to the Debtor in this case.  The Debtor believes that it is in its best interests, and those of its creditors, that DSI be retained to serve as financial advisors to the Debtor in its chapter 11 case.

32. The Debtor initially employed DSI on November 20, 2018. In that capacity, DSI has commenced the review of the financial and operating performance of the Debtor, and has begun to review the Debtor's operating budgets and liquidity. DSI will advise the Debtor with regard to restructuring its financial affairs for the benefit of all constituencies. The continued post-petition retention of DSI is in the best interests of the Debtor.

33.     Due to DSI's extensive experience in restructuring matters, and the Debtor's need to promptly complete is schedules and statement of financial affairs and promptly formulate its plan of reorganization, the Debtor will suffer immediate and irreparable harm if it is unable to obtain the services of DSI in this case. It is, therefore, my belief that only with the granting of an order approving DSI's employment will such immediate and irreparable injury be avoided.

C.  **Debtor's Emergency Motion for Order (I) Authorizing Debtor to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations, (II) Authorizing the Debtor to Maintain Employee Benefit Programs, and (III) Directing Banks to Honor Related Prepetition Transfers (the "Employee Motion").**

34.     The Debtor seeks the relief requested in the Employee Motion because any delay in paying employee compensation, deductions, or benefits will destroy the Debtor's relationships with the employees and irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of these employees are most critical. The Debtor faces the imminent risk that its operations may be severely impaired if the Debtor is not immediately granted authority to make the payments described in the Employee Motion.  Employee support for the Debtor's reorganization efforts is crucial to the success of those efforts, particularly given the unique knowledge of the employees regarding the Debtor's customers and operations.  At this critical early stage of this Chapter 11 Case, the Debtor simply cannot risk the substantial disruption to its business operations that would inevitably attend any decline in work force morale attributable to the Debtor's failure to pay employee compensation, deductions, and benefits in the ordinary course.  Finally, to remain in a position to maintain necessary operational integrity, oversight, and quality control, the Debtor must continue its corporate policies of permitting certain employees to incur business-related expenses and thereafter to seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements.

35. Counsel advises that relief similar to that sought in the Employee Motion has been granted by courts in this and other districts in Florida. *See, e.g., In re Goodman and Dominguez, Inc., et al.*, Case No. 17-17237-RAM (Bankr. S.D. Fla. July 7, 2017); *In re Campbellton-Graceville Hospital Corporation,* Case No. 17-40185-KKS (Bankr. N.D. Fla. May 11, 2017); *In re Wood Resource Recovery, L.L.C.,* Case No. 16-10014-KKS (Bankr. N.D. Fla. Feb. 11, 2016); *In re Goodman and Dominguez, Inc., et al.*, Case No. 16-10056-RAM (Bankr. S.D. Fla. Jan. 1, 2016); *In re Adinath Corp., et al.,* Case No. 15-16885-LMI (Bankr. S.D. Fla. April 17, 2015). Accordingly, in the exercise of my business judgment. I believe that is in the best interests of the Debtor, its estate and creditors to seek the relief requested in the Employee Motion.

36. By separate motion, described below, the Debtor also is requesting authority to file under seal the schedule disclosing, among other things, the names of its 73 employees, amount of compensation sought to be paid, and withholding amounts.

**D.    Debtor's Emergency Motion to File Under Seal Unredacted Schedule to Employee Wage and Benefit Motion (the "<u>Motion to File Under Seal</u>").**

37. In connection with the filing of the Employee Motion, Local Rule 9013-1(I)(1) requires that with respect to proposed payment of prepetition wages or compensation, a debtor disclose, in a schedule, among other things, (a) the names of the employees to whom wages or compensation are sought to be paid, (b) amount due such employees as of the bankruptcy filing, (c) the amounts to be withheld from such wages or compensation, including all applicable payroll taxes and related benefits, (d) the period of time for which prepetition wages or compensation are due, (e) whether the employee is presently employed by the debtor, and (f) whether any of the employees is an insider as defined in 11 U.S.C. § 101(31) (the "<u>Employee Schedule</u>"). Accordingly, absent specific relief to the contrary, the Debtor will be required to make publicly known the compensation of the Debtor's 73 employees. Making payroll information available to

all of the employees and the general public may cause widespread employee anxiety and discord, particularly because employees are earning disparate compensation. The Debtor's policy has not been to publicize each employee's compensation to the other employees, to avoid these adverse effects. For this reason, the Debtor seeks authority to file the Employee Schedule containing personal, sensitive information under seal, and to provide a copy of the Schedule to the Office of the United States Trustee.

38. I understand from counsel that Section 107(b) the Bankruptcy Code, as effectuated through Rule 9018 of the Federal Rules of Bankruptcy Procedure, provides the mechanism though which a bankruptcy court can, if justice so requires, protect an entity with respect to "commercial information," and that Local Rule 5003-1(D) provides the mechanism for the Court to authorize the filing of papers under seal, such as the Employee Schedule. I further understand from counsel that bankruptcy courts in this district have authorized the filing under seal of matters related to or concerning the initial filing of chapter 11 bankruptcy cases, including the same materials as requested herein. *See, e.g., In re Adinath Corp., et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. April 17, 2015); *In re Ruden McClosky, P.A.*, Case No. 11-40603-RBR (Bankr. S.D. Fla. Nov. 7, 2011); *see also In re Cima Mtg. Bankers*, Case No. 05-15121-RAM (Bankr. S.D. Fla. June 7, 2005) (order authorizing debtors to file list of 20 largest creditors, matrix, schedules and statements of financial affairs under seal).

39. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to be able to file the Employee Schedule Under seal and to provide a copy to the Office of the United States Trustee.

E. **Debtor's Emergency Motion for (A) Authority to (I) Maintain Bank Accounts and to Continue to Use Existing Bank Forms and Checks, and (II) Continue to Use Existing**

**Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines (the "Cash Management Motion").**

40. I understand from counsel that the U.S. Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. These guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims. In the Cash Management Motion, the Debtor seeks a waiver of these requirements so that its operations are not further disrupted by the need to alter the Debtor's cash management system.

41. Prior to the commencement of this Chapter 11 Case, in the ordinary course of its business, the Debtor utilized three financial institutions to efficiently collect, transfer and disburse funds generated on a daily basis from their operations (collectively, the "Bank Accounts"). A list of the Debtor's Bank Accounts and the amount on deposit in each such Bank Account as of November 20, 2018 is set forth on **Exhibit A** attached to the Cash Management Motion. In addition to checks, the Debtor also conducts banking transactions by debit, wire or ACH payments, and other similar methods.

42. Through the utilization of the existing cash management system the Debtor is able to facilitate cash forecasting and reporting, monitor collection and manage disbursement of funds, and maintain control over the administration of the bank accounts required to effect the collection,

disbursement, and movement of cash. The movement of funds through the Debtor's cash management system is illustrated in the chart attached as **Exhibit "B"** attached to the Cash Management Motion.

43. The cash management system used by the Debtor constitutes an ordinary, usual, and essential business practice. This system allows the Debtor to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses.

44. The Debtor's operation requires that the cash management system continues during the pendency of this Chapter 11 Case. If the Debtor were required to adopt a new cash management system, its operations would be severely disrupted, which would have an adverse impact on the Debtor's ability to finance its operations in the ordinary course and restructure its financial affairs. Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtor's bankruptcy estate. Accordingly, maintenance of the existing cash management system is essential and in the best interests of all creditors and other parties in interest.

45. The Debtor requests authority to maintain its existing bank accounts and cash management system in accordance with its usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations.

46. The Debtor seeks a waiver of certain operating Guidelines established by the office of the U.S. Trustee regarding cash management. For example, the Debtor seeks a waiver of the requirements that it: (i) close all existing bank accounts; (ii) open new debtor in possession ("DIP") bank accounts; (iii) establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes); (iv) maintain a separate DIP account for cash collateral; (v) obtain checks for all DIP accounts that bear the designation, "debtor in possession," the bankruptcy case number, and the type of account; and (vi) open a new set of books and records

as of the Petition Date. Closing and opening new bank accounts and books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it is now easy to differentiate between pre- and post-petition transactions by date. The Debtor, in the ordinary course of its business, uses many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtor is engaged and the numerous other parties with whom the Debtor deals, the Debtor needs to use its existing bank accounts and business forms without alteration or change. A substantial amount of time and expense would be required in order to close and open new bank accounts and print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, the Debtor requests that it be authorized to continue to use its existing bank account and business forms and to maintain its existing business records.

47. I further understand that section 345 of the Bankruptcy Code and the U.S. Trustee establishes certain requirements with respect to all deposits and investments of money of the estate. The Debtor believes that the banks at which it maintains its accounts are financially stable banking institutions, are FDIC insured and authorized depository pursuant to 11 U.S.C. § 345(b). Additionally, as explained above, the Debtor's Bank Accounts comprise an established cash management system that the Debtor needs to maintain in order to ensure that collections and disbursements from the Bank Accounts are not disrupted. The Debtor will note, in its records, the date and time the chapter 11 petition was filed, and the records will reflect each post-petition receipt and disbursement. Therefore, a waiver of the section 345 deposit guidelines would not pose a risk to the Debtor's estates nor its creditors.

48. The Debtor should be granted further relief from the Guidelines to the extent that they require the Debtor to make all disbursements by check. In particular, the Guidelines require

that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Considering the complexity of the Debtor's operations and the ordinary course of companies in the same business as the Debtor, the Debtor must conduct transactions by debit, wire, or ACH payments and other similar methods, as discussed above. In addition, the Debtor receives a portion of its customer receipts through a variety of payment sources such as, MoneyGram, PayNearMe, ACE Cash Express, debit cards, credit cards, check by phone, online payments, and ACH. To deny the Debtor the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would materially interfere with the Debtor's performance of its contracts and unnecessarily disrupt the Debtor's business operations, as well as create additional costs to the Debtor and destabilize its business operations and adversely affect the prospects of the Debtor's successful reorganization. Therefore, the Debtor requests a waiver of this requirement.

49. The Debtor and I have been advised by counsel that the relief requested in the Cash Management Motion has been granted in other large chapter 11 cases in this District. *See, e.g., In re Goodman and Dominguez, Inc., et al.*, Case No. 17-17237-RAM (Bankr. S.D. Fla. July 7, 2017); *In re Goodman and Dominguez, Inc., et al.*, Case No. 16-10056-RAM (Bankr. S.D. Fla. Feb. 9, 2016); *In re Adinath Corp., et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. May 11, 2015); *In re Florida Gaming Centers, Inc.*, Case No. 13-29597-RAM (Bankr. S.D. Fla. Oct. 7, 2013); *In re TLO, LLC*, Case No. 13-28053-PGH (Bankr. S.D. Fla. June 13, 2013). Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to be granted the relief sought in the Cash Management Motion.

**F.** **Debtor's Emergency Motion for Order (I) Authorizing the Debtor (A) To Use Cash Collateral on an Interim Basis Pursuant to 11 U.S.C. § 363, and (B) To Grant Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. §§ 105, 361, 363**

**and 507, and (II) Schedule a Final Hearing Under Bankruptcy Rule 4001(b) and 9014, and Local Rules 4001-2 and 9013-1(F) and (G) (the "Cash Collateral Motion").**

50.     The Debtor has filed the Cash Collateral Motion to request that the Court enter an interim order (the "Interim Order") substantially in the form attached to the Cash Collateral Motion as **Exhibit "A"** and a final order (the "Final Order", together with the Interim Order, collectively, the "Cash Collateral Orders"), pursuant to sections 105, 361, 363 and 507 of the Bankruptcy Code, Bankruptcy Rule 2002, 4001(b) and 9014, Local Rules 4001-2 and 9013-1(F) and (G), and the Guidelines (i) authorizing the Debtor to (a) use cash collateral, (ii) grant adequate protection in connection therewith, and (iii) scheduling an emergency interim hearing and final hearing on the Cash Collateral Motion.

51.     I incorporate into this Section of the Declaration the statements made in Sections D and E, above, regarding the debt structure regarding the Lenders which claim an interest in cash collateral.

52.     The Lenders are the only entity that can claim an interest in Cash Collateral. Pursuant to the Loan Documents, the Lender assert a security interest in substantially all of the Debtor's assets to secure the obligations of NAL to the Lender. The Debtor proposes to use cash collateral for working capital purposes. The Debtor will continue to use its cash on hand and any cash generated from the operation of its business until such time as the Lender is either paid in full, a plan is confirmed, the case is dismissed, or further order of the Court. As adequate protection for the Debtor's use of Cash Collateral, Lender shall receive, subject to the approval of this Court, *nunc pro tunc* as of the commencement of the Debtor's Chapter 11 Case, adequate protection for the use of cash collateral in accordance with sections 361(2) and 363(e) of the Bankruptcy Code, in the form of a replacement lien on and in all property of the Debtor acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as

the Lenders have duly perfected security interests in the property of the Debtor securing the prepetition obligations to the Lender under the Loan Documents. No additional liens, other than the replacement lien, will be provided to the Lender.

53. I am informed by counsel that the foregoing disclosures are provided in conformance with the requirements of Bankruptcy Rule 4001(b), Local Rules 4001-2, 9013-1(F) and (G), and that through the Cash Collateral Motion the Debtor seeks to utilize cash collateral in order to maintain its business. The Debtor's request for use of cash collateral is meant to cover the its essential expenses contained in the Budget, and to ensure successful operations to allow the Debtor to expeditiously proceed through this Chapter 11 Case. Those expenses include payment of wages, taxes, insurance and other expenses that are needed to perform under the Debtor's commercial business. The Debtor requests the use of the cash collateral through the time that the Lender is paid in full, the Debtor emerges from chapter 11 under a confirmed plan or further order of the Court. Unless authorized to use the cash received in the ordinary course of business, the Debtor will be unable to remain in business.

54. I am informed by counsel that, pursuant to Bankruptcy Rule 4001(b)(2), a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2). I believe that it is essential to the continued operation of the Debtor's business that it be authorized by this Court to use cash collateral as set forth in the Interim Order pending the final hearing on the Cash Collateral Motion. Unless the Cash Collateral Motion is approved on an interim basis, the Debtor will be unable to pay its suppliers and satisfy its customer obligations or pay its employees which would have a devastating effect on the Debtor's operations, customer

base and revenues. Thus, funds are urgently needed to meet all of the Debtor's working capital and other liquidity needs. In the absence of immediate relief, the Debtor's attempt to continue its business in the ordinary course will be immediately and irreparably jeopardized.

55. Such interim relief is essential to enable the Debtor to fulfill its existing obligations, as specifically detailed in the Budget. These sums will be required to pay employees, and other operating expenses that are the very minimum necessary for the Debtor to continue as a going concern for the benefit of all of its creditor constituencies, including the Lenders. If the Debtor is unable to use cash collateral or obtain such additional liquidity, it will not be able to meet essential obligations thereby forcing a shutdown of its operations. Accordingly, I believe that the Debtor and its creditors face a substantial risk of immediate and irreparable harm if the relief sought in the Cash Collateral Motion is not permitted on an interim as well as final basis. For all of these reasons, I believe that the relief requested in the Cash Collateral Motion will inure to the benefit of the Debtor, its estate, creditors and all other interested parties. Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtor, its estate and creditors to be granted the relief sought in the Cash Collateral Motion.

### IV.   DEBTOR'S OBJECTIVES IN THIS CASE

56. The primary purpose of the filing of this Chapter 11 Case is to restructure its financial affairs for the benefit of its customers, secured creditors, employees, vendors, and other unsecured creditors and continue operating post-bankruptcy. Through the First Day Motions described above and other motions and applications the Debtor intends to file shortly after the Petition Date, the Debtor hopes to minimize any adverse effects that this Chapter 11 Case might otherwise have on its business. For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

## V. CONCLUSION

57. To successfully reorganize, the Debtor's immediate objective is to continue efforts to stabilize following the commencement of this case by minimizing any adverse impact of the filing of this Chapter 11 Case on the Debtor's assets and operations and protect the interests of their employees, creditors and other stakeholders. For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions.

### 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 23rd day of November, 2018 in Miami, Florida.

_____
Dania Infante-Ramos, Vice-President, Chief Financial Officer and Chief Operating Officer of National Auto Lenders, Inc.

8562207-6